IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In re:

ELLA DORIS LEE,              )    Case No. 07-02643-TOM-13
                           )    Chapter 13
          Debtor.      )


ELLA DORIS LEE,            )
                           )
          Plaintiff,     )
                           )
v.                       )    Adv. Proc. No. 07-00155
                           )
CITY OF BIRMINGHAM AND CITY   )
OF BIRMINGHAM RETIREMENT    )
AND RELIEF SYSTEM,          )
                           )
          Defendants.   )


## <u>MEMORANDUM OPINION</u>

This matter came before the Court for trial on April 15, 2008 on the Complaint (adv.

proc. doc. no. 1[1]) filed by Ella Doris Lee (the "Debtor") and the Answer to Complaint (adv. proc.

doc. no. 4) filed by the City of Birmingham and the City of Birmingham Retirement and Relief

System (the "Retirement System") (each individually a "Defendant" and, collectively, the

"Defendants"). Appearing at the hearing were Michael Antonio, attorney for the Debtor, the

Debtor, and Patricia Burns and Malera Traylor-Wright, attorneys for the Defendants. The Court

heard testimony from the Debtor, from Bettye Griggs, a senior auditor in the finance department

---

[1]References to documents filed in the adversary proceeding are referred to as "adv. proc. doc. no." while references to documents filed in the underlying bankruptcy case are referred to as "doc. no." unless the reference specifically notes a prior bankruptcy case.

1

of the City of Birmingham[2], and from Michael Johnson, the Deputy Director of Finance for the City of Birmingham[3]. In the Complaint, the Debtor alleges that by withholding two loan payments from her retirement income, post-petition, the Defendants violated the automatic stay and violated the Fair Debt Collections Practices Act. Further, in pleadings filed prior to trial, at the request of the Court, the Debtor alleges that the debt to the Defendants is subject to discharge because the Defendants did not file a proof of claim and that the debt is no longer due and owing because the loan documents were stamped "CANCELLED". This Court has jurisdiction under 28 U.S.C. § 1334(b) and 28 U.S.C. § 157. The Court has considered the pleadings, the arguments of counsel, the evidence, and law, and finds and concludes as follows:

<u>FINDINGS OF FACT</u>[4]

### A.      The Pension Loan

On March 8, 2000, the Debtor, at the time an employee of the Birmingham Parks and Recreation Board, applied for a pension loan with the Retirement System. <u>See</u> <u>Debtor's Exhibit 2</u>. The Debtor already had a pension loan with the Retirement System and requested with this new loan application the maximum amount she was eligible to borrow, $8,000.00 shown plainly on the face of the loan application. The application was approved and on March 17, 2000 (the loan date) the Debtor received $931.60 bringing her total indebtedness to the Retirement System

---

[2] It was explained at trial that while Ms. Griggs works at the City of Birmingham her position is funded by the Retirement System.
[3] During the eight years he worked at the City of Birmingham, Mr. Johnson served as the interim director and the director of the finance department. By statute, the director of the finance for the City of Birmingham also serves as the treasurer of the Retirement Systems pension fund.
[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. <u>See</u> <u>ITT Rayonier, Inc. v. U.S.</u>, 651 F.2d 343 (5th Cir. 1981); <u>Florida v. Charley Toppino & Sons, Inc.</u>, 514 F.2d 700, 704 (5th Cir. 1975).

2

up to the maximum $8,000.00 at 6% interest. Pursuant to the Promissory Note and Pension Loan Repayment Schedule, the Debtor was to make 26 monthly payments, as was the protocol for all pension loans. See Debtor's Exhibit 2.

Four days after receiving this additional loan, on March 21, 2000, the Debtor retired from the Birmingham Parks and Recreation Board and began drawing regular, monthly pension disbursements in the amount of $2,255.00, from which the Retirement System withheld the payments due it under the Promissory Note.

### B.     The Debtor's Prior Bankruptcy Filings

On October 13, 2000, shortly after maxing out her pension loan and retiring, the Debtor filed a chapter 13 bankruptcy petition, case no. 00-06407. The Retirement System filed a secured proof of claim, claim no. 6, in her bankruptcy case in the amount of $6,769.20, the amount due after the Debtor made only 4 payments[5] on the loan before she filed for bankruptcy. See Debtor's Exhibit 11. On May 6, 2003, the Debtor's 00-06407 case was dismissed. Id. The Retirement System did not receive any distributions on their claim during the first chapter 13 case. See Case No. 00-06407, Chapter 13 Trustee's Final Report and Account (doc. no. 23).

Three days later on May 9, 2003, the Debtor filed a second chapter 13 petition, case no. 03-04165. The Retirement System again filed a proof of claim in the amount of $6,769.20, claim no. 7. See Debtor's Exhibit 12. This second chapter 13 case was dismissed on June 13, 2007 at the Debtor's request. See Case No. 03-04165 (doc. nos. 34 and 36). Again, no funds were distributed in that case to the Retirement System on account of its claim. See Case No. 03-

---

[5] As noted later in this Memorandum Opinion, payments on loans by retired employees are deducted or offset from the former employees' pension distributions.

04165, Chapter 13 Trustee's Final Report and Account (doc. no. 38). In fact, the only creditors to receive funds were secured creditors and Debtor's counsel. Id.

On June 15, 2007, a copy of the dismissal order in case no. 03-04165 was sent to both Defendants by the Clerk's Office. On June 19, 2007, Michael Fliegal, in the legal department of the Retirement System, emailed Bettye Griggs, a senior auditor in the finance department employed by the Retirement System, and advised her that the Debtor's case had been dismissed. Ms. Griggs then removed the stop indicator on the Debtor's account so that the Retirement System could resume offsetting pension distributions by the amount due each month on the Promissory Note. The testimony of Ms. Griggs was that pension distributions are made once a month on the first of each month. Ms. Griggs also testified that the Debtor received her pension distributions via direct deposit. Once the stop indicator was removed, offsetting payments reduced the Debtor's pension distributions beginning with the July 1, 2007 distribution. On the July 2007 distribution, the Retirement System withheld $307.70 in principal and $516.31 in interest. See Debtor's Exhibit 19. On the next distribution on August 1, 2007 the Retirement System withheld $307.70 in principal and $32.93 in interest. Id. By that time, however, the Debtor was in another chapter 13 case leading to this action as described below.

C.    **The Current Bankruptcy Case**

The day after her second chapter 13 case was dismissed, the Debtor filed this third chapter 13 case case no. 07-02643. The Debtor listed the $6,769.20 debt owed to the Retirement System on Schedule F as an unliquidated, unsecured debt. Contemporaneous with filing her third chapter 13 case, the Debtor filed her Chapter 13 Plan (doc. no. 3) and a Motion to Extend

the Automatic Stay (the "Stay Motion") (doc. no. 7) pursuant to section 362(c)(4)(B)[6]. The plan proposed to pay $310.00 per month to the Chapter 13 Trustee with unsecured creditors including the Retirement System to receive 100% of their claim over sixty months.

A hearing on the Stay Motion was held on July 12, 2007. Michael Antonio, counsel for the Debtor, the Debtor, Shea Patrick, Staff Attorney for the Chapter 13 Trustee, and Michael Fleigel, attorney for the City of Birmingham and the Retirement System, appeared at the hearing. The Stay Motion was granted with respect to all creditors except for the Retirement System[7]. Mr. Fleigel, on behalf of the Retirement System, represented at the hearing that it would be objecting to confirmation based on the Debtor's proposal to pay the loan through the Trustee. The Retirement System asserted that, pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 which generally became effective October 17, 2005, setoff by the Retirement System was not stayed by the filing of a bankruptcy petition pursuant to section 362(b) (19) of the Bankruptcy Code. The Retirement System asserted that since the amounts setoff were not property of the estate, the Retirement System was not subject to the stay and could continue to setoff until its loan was repaid and should not be paid through the Chapter 13 Trustee.

The Debtor argued that the Retirement System was subject to the automatic stay because section 362(b) (19) only deals with wages of the Debtor and not with retirement distributions.

---

[6] The Court noted on the record at the hearing on the Stay Motion that the motion should have been brought pursuant to section 362(c)(3)(B) rather than section 362(c)(4)(B) because the Debtor only had one prior case dismissed in the year prior the instant filing.

[7] The order granting the Stay Motion refers to the City of Birmingham and not the Retirement System; however, the objection to confirmation was filed by the Retirement System and not the City of Birmingham. The Retirement System is the creditor on the pension loan.

5

The Debtor argued that she was retired, was no longer drawing "wages"[8] from the City of Birmingham and therefore the exception contained in section 362(b)(19) was inapplicable and the Retirement System was stayed from setting off against her retirement checks. Because the issue was not before the Court at that time, the Court extended the stay until the Retirement System's objection to confirmation was resolved (doc. no. 19).

On July 19, 2007, after the Retirement System filed its objection to confirmation (doc. no. 18) the Debtor filed an amended chapter 13 plan (doc. no. 23). The amended plan still provided for 100% distribution to unsecured creditors and made only minor changes to the original plan, none of which are relevant to this dispute. The Debtor filed a Response to the objection to confirmation (doc. no. 28) and the Retirement System filed an amended objection (doc. no. 31).

The following day, on July 20, 2007, the Debtor filed certain amendments to her schedules and filed this adversary proceeding against the Defendants. In the Complaint the Debtor alleges violation of the Fair Debt Collection Practices Act and violation of the automatic stay for two post-petition withholdings made by the Retirement System, one on July 1, 2007 in the amount of $824.01 (consisting of $307.70 of principal and $516.31 of interest) and one on August 1, 2007 in the amount of $340.63 (consisting of $307.70 of principal and $32.93 of interest).

---

[8] The Debtor's Form 22C shows in line #2 "wages" of $92.00; however, at a prior hearing it was explained these "wages" were from a part-time job and not from any employment with the City of Birmingham. The Debtor's Schedule I (doc. no. 1) also reflects "wages, salary, and commissions" of $92.00.

6

The Debtor then filed a Second Amended Plan (the "Plan") (doc. no. 40). Specifically, the Plan included a special provision that read "[i]n accordance with the provisions contained in 11 U.S.C. section 1321(f)[9] a pass through payment of $307.70 is to be paid monthly to the City of Birmingham Retirement and Relief System." The Debtor thereafter filed an amendment to her schedules to list the debt owed to the Retirement System as disputed (doc. no. 45) consistent with the adversary proceeding.

A confirmation hearing was held on January 7, 2008. At the confirmation hearing, the Court overruled the Retirement System's objection and confirmed the Plan[10] (the "Confirmation Order") (doc. no. 58). The Confirmation Order provides that the Retirement System shall continue to withhold $307.70 from the Debtor's pension distributions and forward those funds to the Chapter 13 Trustee to be held in an adjustment account until further order of the Court pending the resolution of this adversary proceeding.

---

[9] The Court assumes the reference to section 1321(f) is a typographical error and was intended to be a reference to section 1322(f), there is no subsection (f) in section 1321 and section 1322(f) provides: "A plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section 1325."

[10] The Court may have been premature in confirming the Plan while the adversary proceeding was still pending; however, because the Debtor had a significant mortgage arrearage and because no distributions are made until confirmation, the Court confirmed the Plan so that the mortgage company would start to receive distributions. Had the Court and the Trustee known about the unlisted debt to the Debtor's friend and the repayment of that debt, discussed later in this opinion, as well as payments made to her brother, the Court might not have confirmed the Plan because the Debtor's arguments to evade payment on her pension loan may have caused the Court and the Trustee to question whether the Plan was filed in good faith.

7

**D.     The Retirement System**[11]

The Retirement System pension is a defined benefit plan.  The retirement benefit paid to employees is based on the number of years of service, the average salary of the employee over the employee's last three years and a multiplier determined by an actuary employed by the Retirement System.  Pension funds are held by the Retirement System.  Checks are cut on a City of Birmingham account and the Retirement System reimburses the City of Birmingham.  The City of Birmingham provides certain administrative functions, like cutting the actual checks, but the fund is controlled solely by the Retirement System and the City of Birmingham has no control or discretion in cutting the checks.  Additionally, the director of finance for the City of Birmingham also serves as the treasurer of the Retirement System pension fund.

Procedurally, to obtain a pension loan, the employee completes an application which is reviewed and either approved or denied by the finance department.  If an application is approved, the file is turned over to the cash and investment management department where the employee physically receives a check for the loaned amount and a copy of the relevant paperwork.  The check is a City of Birmingham check signed by the director of finance of the City of Birmingham serving as the treasurer of the Retirement System fund.  Additionally, if the loan was a refinance (that is, if the employee already had a loan and increased the loaned amount to include the prior amount and the current request), the old loan documents would be stamped cancelled and returned to the employee when the new loan was issued.  Employees in the cash

---

[11] These findings of fact are based largely on the testimony of Ms. Griggs and Mr. Johnson, whom the Court finds to be credible and knowledgeable.  There does not appear to be a dispute between the parties as to the inner workings of the Retirement System and their testimony was not challenged.

8

and investment management division that work with the public at the front counter (which was referred to as "the cage" during trial) are given a list of which accounts to stamp cancelled and they have no discretion in determining what accounts can be stamped cancelled. Ms. Griggs and Mr. Johnson both testified that no one has authority or discretion to stamp "cancelled" on a loan that has not been paid in full. Ms. Griggs testified at trial that the Retirement System makes about 3,000 loans a year with each loan averaging $2,500.00.

In this case, the Debtor applied for a loan on March 8, 2000. See Debtor's Exhibit 2. The loan was approved and she refinanced her existing loan maxing out the amount she could borrow on March 17, 2000. Id. There was no testimony at trial as to whether she received her old loan documents back with the cancelled stamp on them but that issue is not material to this litigation. The Retirement System then began receiving payments on the pension loan. A total of four payments were taken from her retirement distribution and credited before the Debtor filed her first chapter 13 case reducing the debt owed to the Retirement System from $8,000.00 to $6,769.20. As previously noted, no payments were made on the Retirement System's proofs of claim during either the first or second bankruptcy case. In this case the Court instructed the Retirement System to withhold regular principal payments in the amount of $307.70 and to remit those funds to the Chapter 13 Trustee who is holding them in an adjustment account pending resolution of this dispute[12].

Further, during discovery for this adversary proceeding, the Debtor obtained a copy of her loan which was stamped "CANCELLED" even though the loan was unpaid. The testimony

---

[12] Although the Court confirmed the Debtor's Plan so the payments would begin on the mortgage arrearage, this provision in the Confirmation Order basically maintained the status quo between the Retirement System and the Debtor until this dispute was resolved.

9

of the Retirement System's witness was that no one had authority to cancel an unpaid loan. Despite this fact, at trial the Debtor introduced eight other unpaid pension loans[13] similarly stamped "CANCELLED." The testimony of Ms. Griggs at trial shed some light on these particular loans. Generally, the loans must be repaid within three years according to the terms of the loans, 26 monthly installments. Therefore, there are very few pension loans that are more than three years old. If, however, an employee is terminated or quits prior to retirement the Retirement System has no ability to collect on the loan until the former employee begins to collect their pension. This was the situation with three of the unpaid loans that were stamped cancelled. When those former employees begin drawing their pension the Retirement System will deduct the payments due. Two of the other loans involved individuals who are currently in chapter 13 cases where the Retirement System is receiving payments on the loans directly from the chapter 13 Trustee[14]. Two of the other loans marked cancelled involved retirees where payments due on unpaid pension loan were being withheld, similar to the withholdings against the Debtor's pension checks. The final loan stamped cancelled was to a current employee who was repaying the loan through wage withholdings.

---

[13] The Court notes that the new loan documents include a provision that reads: "A pension loan cannot be processed 30 days prior to your anticipated retirement date. Do not submit any application after your retirement interview in the personnel department." Had this provision been in effect in 2000, this last loan to the Debtor would not have been approved. The Debtor testified that she signed her retirement paperwork on February 23, 2000, applied for the loan on March 8, 2000, received the loan on March 18, 2000, and then subsequently retired on March 21, 2000.

[14] At trial, it was represented by the Retirement System that the "cancelled" loans of two other individuals were in bankruptcy. The Court's review of PACER, however, shows that one individual's case was dismissed in January 2008 for failure to make plan payments. Further, the two cases at issue were both filed prior to the implementation of the "new" bankruptcy law (enacted April 20, 2005 and effective in cases filed after October 17, 2005) which included new sections regarding pension loan repayments.

10

### E.    The Adversary Proceeding

As noted above, the Debtor instituted this adversary proceeding alleging violations of the Fair Debt Collections Practices Act and violations of the automatic stay for the July and August 2007 withholdings. At trial, the Debtor testified that on July 1, 2007 when the first withholding occurred it threw the Debtor into a "financial tailspin." She testified that she was behind on her utilities but had worked out an arrangement with Alabama Power that she then was unable to perform on. She testified that pursuant to the arrangement with Alabama Power, she had until June 10, 2007 to pay $300.00; however, her testimony was that because funds were withheld she did not make this payment. She also testified that as a result of the Retirement System's withholding, she got behind on her water bill, her telephone and cell phone bills forcing her to borrow money from a friend, Annie Gamble. The Debtor stated that she called Ms. Gamble on June 3, 2007 and was able to borrow money from Ms. Gamble to "get her bills in order." The Debtor, however, failed to schedule this debt to Ms. Gamble and at trial was the first time the Court or the Trustee was made aware of the debt.

The Debtor also testified that in early 2008 when she received her 2007 income tax refund she repaid Ms. Gamble a total of $950.00 which repaid the debt in full. This payment on an undisclosed and unlisted pre-petition debt is clearly prohibited by the Bankruptcy Code. The pre-petition debt should have been scheduled and the creditor should have received payments from the Trustee not directly from the Debtor and not ahead of other unsecured creditors. She testified that her total income tax refund was approximately $2,100 and she used the additional funds to pay medical bills, pay her car insurance and gave her brother between $300.00-$400.00 because he had been helping her with groceries.

11

Following the withholdings on July 1, 2007 and August 1, 2007 and correspondence between counsel for the Debtor and counsel for the Retirement System and the City of Birmingham, on August 1, 2007 the Retirement System refunded both withholdings to the Debtor pending resolution of this matter. The Retirement System refunded a total of $1,164.64 by check dated August 1, 2007, which the Debtor cashed on August 7, 2007. The Debtor testified that she used those funds for groceries and for post-petition medical bills, proof of which was not provided at trial.

<u>CONCLUSIONS OF LAW</u>

In her complaint the Debtor asserts that the Defendants: (1) violated the Fair Debt Collections Practices Act, and (2) violated the automatic stay. After discovery was complete and at the direction of the Court, the Debtor filed a Statement of Issues (doc. no. 52) and added allegations; specifically, the Debtor alleged that the (1) the debt was discharged by the stamping of the word "CANCELLED" on the loan application and note, and (2) the debt was subject to being discharged in the current bankruptcy case because the Retirement System failed to file a claim. The Retirement System argues that the Debtor would be unjustly enriched if permitted to evade repayment of the loan. The Court will address each allegation separately below.

**A.      The Debtor's Arguments**

**1.  Violation of the Fair Debt Collection Practices Act**

The Fair Debt Collections Practices Act ("FDCPA") applies only to "debt collectors" as defined in the FDCPA and does not apply to "creditors". <u>15 U.S.C.A. § 1592</u>, <u>see also</u> <u>Neff v. Capital Acquisitions & Mgmt. Co.</u>, 352 F.3d 1118 (7th Cir. 2003); <u>Stafford v. Cross Country Bank</u>, 262 F.Supp.2d 1776 (W.D. Ky. 2003). "Debt collectors" are defined as "any person who

12

uses any instrumentality of interstate commerce or the mails in any business the principal

purpose of which is the collection of any debts, or who regularly collects or attempt to collect,

directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C.A. §

1692a (6).  A "creditor" on the other hand is defined as "any person who offers or extends credit

creating a debt or to whom a debt is owed…."  Id.

At trial the Debtor argued that the debt is with the Retirement System but that it is the

City of Birmingham that withheld the funds and since the debt is not owed to the City of

Birmingham, the City of Birmingham is a "debt collector" and subject to FDCPA.  The

testimony of both Ms. Griggs and Mr. Johnson was that the City of Birmingham provides certain

administrative functions for the Retirement System.  The Debtor contends that the funds were

withheld by the City of Birmingham and that the refund was by the City of Birmingham.  The

checks were issued on a City of Birmingham consolidated account and signed by Mac

Underwood, the former Director of Finance for the City of Birmingham but ALSO the Treasurer

by virtue of his position of the Retirement System's fund.  Based on the testimony, the debt is to

the Retirement System and the Retirement System is the only party attempting to collect this

debt.  There was no evidence to show that the City of Birmingham has done anything to collect

on this debt other than perform certain administrative functions on behalf of the Retirement

System and at the sole direction and discretion of the Retirement System.  Thus, this Court

concludes that since the Retirement System was attempting to collect its own debt (and not that

of another) and the City of Birmingham took no action to collect the debt, neither Defendant is a

"debt collector" and subject to FDCPA.

13

## 2.     Violation of the Automatic Stay

Section 362 of the Bankruptcy Code automatically imposes a stay upon the filing of a petition for relief under Title 11.  The automatic stay, however, does not apply to "withholding of income from a debtor's wages…under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer…."  11 U.S.C. § 362(b)(19).  At trial there was no dispute that the Debtor authorized the Retirement System, an affiliate of her employer, to withhold loan payments from her wages or retirement checks pursuant to the loan documents.  The Debtor contends though that only withholdings from "wages" are excepted from the automatic stay and that her retirement checks do not constitute "wages."

"Wages" are not defined in the Bankruptcy Code.  The Debtor points to the definition of wages found in Black's Law Dictionary (4th edition) and in the Alabama Code.  Black's Law Dictionary defines "wages" as "compensation given to a hired person for his or her services." Section 25-5-1(6) of the Alabama Code directs that "wages" and "weekly wages" are to be "construed to mean 'average weekly earnings', based on those earnings subject to federal income taxation and reportable on the Federal W-2 tax form…."  Pension is defined in section 36-27-1 of the Alabama Code as "[p]ayments for life derived from money provided by the employer.  All pensions shall be payable in equal monthly installments."  Because the Debtor's pension payments are reported on a Form 1099-R rather than a W-2 and because the payments are for life and not for services provided, the Debtor argues that her pension checks are not "wages" under

14

the Bankruptcy Code and therefore protected by the automatic stay.  See Debtor's Response (doc. no. 28).  No contrary law was cited by the Defendants.

Further supporting the Debtor's position that her pension checks are not "wages" is the fact that the Bankruptcy Code, in defining who can be a debtor in section 109, uses the term "income" rather than "wages."  Like "wages", the term "income" is not defined[15].  However, the Court notes that prior to the 1978 bankruptcy reform, chapter 13-type relief was available only to a "wage earner."  It is clear that the term "income" is more inclusive than the term "wages"[16].  If section 109(e) provided that only individuals with "regular wages" could be a debtor, many of our current debtors who rely solely on social security benefits or pension payments would not be eligible as they do not receive what is commonly understood to mean "wages", which clearly contradicts legislative intent.  See H.R. Rep. No. 595, 95th Cong., 1st Sess. 313.

Additionally, Form 22C (Chapter 13 Statement of  Current Monthly Income and Calculation of Commitment Period and Disposable Income) has separate entries for "gross wages, salaries, tips, bonuses, overtime, commissions" and for "pension and retirement income." Similarly, Schedule I (Current Income of Individual Debtor(s)) also has separate entries for wages and for "pension or retirement income."  This distinction further supports the Debtor's position that her retirement check does not fall within the "wages" exception in section 362(b)

---

[15] The Court notes that although "income" is not defined in the Bankruptcy Code, the term "individual with regular income" is defined.  Section 101 defines "individual with regular income" as an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13…."

[16] See Matter of Moore, 17 B.R. 551 (Bankr. M.D. Fla. 1982) (individual who receives income from social security is eligible for chapter 13); In re Rigales, 290 B.R. 401 (Bankr. D. N.M. 2003) (income individual received from monthly social security payments and food stamps was sufficiently "regular" to make individual eligible for chapter 13); In re Howell, 4 B.R. 102 (Bankr. M.D. Tenn. 1980) (individuals receiving disability income were eligible for chapter 13).

15

(19).  The Court concludes that the Debtor's arguments are technically sound and correct.

Because the Debtor's pension checks do not constitute "wages" under section 362(b) (19), the

Retirement System violated the automatic stay in withholding amounts due it on the unpaid

pension loan.

Section 362(k) allows an individual to recover damages from a stay violation for any

"willful injury."[17]  The Debtor had the burden to prove 1) a willful injury and 2) that she suffered

damages.  The withholdings were done based upon the Debtor's previous bankruptcy case being

dismissed.  The Retirement System had no way of knowing the Debtor was planning to

immediately file this (her third) chapter 13 case.  The first deduction was done while the

Retirement System was unaware of the Debtor's third bankruptcy filing.  The second deduction

by the Retirement System was after it had notice of the new bankruptcy case but according to the

testimony, it was unable to stop the deduction in time for the August cut.

Further, no damages were proven at trial.  The Debtor testified about the "financial

tailspin" caused by the withholdings; however, the debts she alleged she was unable to pay due

to the withholdings were all incurred, due and payable prior to the July 2007 withholding and

prior to her June 14, 2007 bankruptcy filing.  The arrangement[18] with Alabama Power called for

---

[17] An action is considered "willful" if the creditor engages in a deliberate action that violates the automatic stay with knowledge that the debtor has filed a bankruptcy petition.  See In re Matthews, 184 B.R. 594 (Bankr. S.D. Ala. 1995).  Like In re Rijos, 260 B.R. 330 (Bankr. D. Puerto Rico 2001), the first violation by the Retirement System was a mere technical violation, where the credit card company mailed out a billing statement before it received notice of the debtor's bankruptcy petition.  The second violation in Rijos, where the credit card company had notice but failed to correct their computer program in time to prevent a second bill from being mailed, was "accidental" and did not rise to the level of "willful".  Id.

[18] There was no evidence offered at trial to support her testimony with respect to any arrangement with Alabama Power or with respect to any delinquencies caused by the withholdings.

16

her to make a $300.00 payment by June 10, 2007, well before the first withholding.

Additionally, the loan she received from Ms. Gamble occurred in June 2007 which was also

prior to the withholding. In fact, the Debtor amended her schedules on July 20, 2007 to add a

pre-petition debt of $800.00 owed to Alabama Power[19]. The Debtor's delinquency with

Alabama Power by her own admission via her schedules, occurred prior to filing this case and

prior to any withholding by the Retirement System. Finally, the Defendants had the money only

thirty-one days and refunded the money quickly.

Based on the Debtor's own testimony and timeline, the Court finds that the Debtor did

not prove any willful conduct nor did she suffer any damages. No actual or punitive damages are

appropriate in this case.

### 3. Cancellation of Debt

The Debtor further argues that the debt was cancelled when it was stamped

"CANCELLED" as evidenced by Debtor's Exhibit 2. The testimony at trial was that no one at

the City of Birmingham or at the Retirement System had authority to stamp an unpaid pension

loan "CANCELLED" let alone actually cancel the debt. The actions in scheduling the loan in

her prior cases and in the current case indicate to this Court that the Debtor was aware of the debt

and did not dispute the debt. The Debtor testified at trial that when, during discovery in this

adversary proceeding, she received a copy of the promissory note stamped "CANCELLED" she

believed the debt was cancelled and that she no longer owed it. The Debtor testified that she did

---

[19] It is not clear whether by adding Alabama Power the Debtor paid some funds to
Alabama Power and this is a balance still due or whether the Debtor borrowed money from Ms.
Gamble and used it for other purposes. The attachment to Alabama Power's proof of claim
reflects payments of $0.00 and a credit for a deposit of $135.29. This information makes the
Debtor's testimony regarding payments to Alabama Power questionable.

17

not know why the note was stamped "CANCELLED" nor did she know who stamped it "CANCELLED."

Under Alabama law, the cancellation of a promissory note has no effect "when it is the product of a mistake or clerical error." <u>Gloor v. BancorpSouth Bank</u>, 925 So.2d 984 (Ala. Civ. App. 2005). The Debtor does not dispute that prior to receiving the "CANCELLED" promissory note, she owed the debt and she listed it in her case as evidenced by Schedule F filed by the Debtor. The Debtor, however, argues that the cancellation was not a mistake or clerical error. In support of this allegation, the Debtor points to the eight other loans, many of which involved older loans like her loan that were stamped cancelled. The Debtor argues that it is "extremely far-fetched to believe that each of these cancellations was done unintentional [sic]." <u>See Debtor's Supplemental Brief</u> (adv. proc. no. 69).

Cancellation of pension loans is handled by personnel in the Retirement System's cashier's office, who have no authority to cancel a pension loan other than the loans listed on the spreadsheets provided to the cashier's office. The Retirement System processes approximately 3,000 loan applications a year. Given that all of the loans stamped cancelled were unpaid and the testimony of the Retirement System that no one had authority to cancel an unpaid loan, the Court finds that the unpaid loans stamped cancelled were the result of clerical error and mistake and not intentional. The Debtor's note was mistakenly stamped "CANCELLED" and based on <u>Gloor</u> the stamping of the note has no effect.

18

### 4. Dischargability of the Debt Due to Failure to File a Claim

The Debtor contends that because the Retirement System did not file a claim[20], the debt will be discharged once her Plan payments are completed and she receives her discharge. The Retirement System asserts that it is not required to file a claim in the Debtor's case because the pension loan is not a "debt" under the Bankruptcy Code. See NY City Employees' Retirement Sys. v. Villarie, 648 F.2d 810 (2d Cir. 1981); Eisen v. Thompson (In re Thompson), 370B.R. 762 (Bankr. N.D. Ohio 2007); In re Esquivel, 239 B.R. 146 (Bankr. E.D. Mich. 1999). In Villarie, a city retirement system brought an action seeking a determination that a pension loan was not a "debt" under the Bankruptcy Code and therefore could not be discharged. Id. The appellate court overturned the district court, affirming the bankruptcy court holding and found that the pension loan was not a "debt" and that the retirement system could continue to withhold from the debtor's weekly compensation notwithstanding the debtor's bankruptcy filing. Id. Following the logic in Villarie, the Retirement System has an argument that the loan is not a "debt" and that it therefore does not have an enforceable "claim" against the Debtor. Id. at 812. The Retirement System offered testimony at trial that like the retirement system in Villarie, it does not have the right to sue on the debt upon default. The Retirement System asserts that like in the Villarie

---

[20] It is unclear whether, if found to be a debt, the Retirement System would have a secured or unsecured claim. There was testimony at trial that when an employee retired with an unpaid pension loan, the employee had two choices: (1) to repay the entire loan immediately or (2) to name the Retirement System as the beneficiary on the employee's group life insurance policy. No further testimony was elicited on this point and the Court is unsure whether the Debtor named the Retirement System as a beneficiary when she retired, since she clearly did not repay the loan in full, and if that beneficiary designation is still in place. Although no party offered any evidence about this insurance, the Court notes that according to the Employee Income Records (doc. no. 6) filed by the Debtor, $5.80 is withheld from her pension for "Fortis Life."

19

case, its only recourse was to reduce future benefit payments made to the Debtor until the loan was repaid.  Id.

Nevertheless, if this Court were to find that the loan is a debt, the Retirement System has asserted that at the very least it filed an informal proof of claim.  To constitute an informal proof of claim, the document filed must make the court aware of the claim, include the nature and the amount of the claim, if known, and indicate the creditor's intention to hold the debtor liable for the claim.  The Charter Co. v. Dioxin Claimants (In re The Charter Co.), 876 F.2d 862 (11th Cir. 1989).  The Retirement System filed an objection to confirmation which put the Court and Debtor on notice of the pension loan and of the Retirement System's intention to collect on it. The objection was filed prior to confirmation and prior to the bar date.  Additionally, a representative from the Retirement System was present at the hearing on the Debtor's motion to extend the automatic stay and informed the Court and counsel for the Debtor of the situation. Certainly, if required to file a claim, the objection and the numerous pleadings filed in this adversary proceeding constitute an informal proof of claim on behalf of the Retirement System.

The Court need not reach any conclusion on this allegation because section 523(a) (18)[21] determines the outcome and provides that debts owed a retirement plan cannot be discharged in bankruptcy.  Thus, the Court finds the debt owed to the Retirement System is non-dischargeable.

## B.     The Defendants' Argument: Unjust Enrichment

The Debtor borrowed $8,000.00 from commingled funds being held by the Retirement System for retirement distributions to all of its employees.  She did not simply "borrow"

---

[21] This section was enacted on April 20, 2005 and became effective in all cases filed on or after October 17, 2005, thus it applies in this case but would not apply in Villarie.

20

$8,000.00 from the actual dollars she contributed to the Retirement System. If the debt is cancelled or otherwise unpaid, she will not have her retirement income decrease by the $6,769.20 that she has not repaid. Instead the burden of those unpaid funds falls on all of the retirees of the Retirement System with no impact on the Debtor and her retirement. To allow her to continue receiving her regular retirement income without repaying the pension loan unjustly enriches the Debtor and the Court finds this inequitable. The Court also notes that the Debtor failed to list her debt to her friend, Ms. Gamble and then repaid her ahead of other creditors including the Defendants. This conduct was contrary to bankruptcy law and was clearly done to benefit the Debtor's friend. The Court will not allow the Debtor to have repaid her friend on an unlisted, unscheduled debt, but then default on her debt to the Retirement System based upon a clerical error.

### C. The Effect of the Confirmed Chapter 13 Plan

As noted above, the Confirmation Order provides that the Retirement System was entitled to withhold $307.70, the regular monthly principal payment on the unpaid pension loan, and then to remit those funds to the Trustee to hold in an adjustment account pending the outcome of this matter. Given the resolution of this matter, the Court must alter or amend the Confirmation Order in light of section 1322(f). Section 1322(f) provides that a "plan may not materially alter the terms of a loan described in section 362(b) (19)…." There is no dispute that the pension loan is covered by this language. The Court finds that repayment of principal only materially alters the terms of the unpaid pension loan. Therefore, the Confirmation Order must be amended to provide for repayment of the unpaid pension loan according to the terms of the Promissory Note.

21

A separate order consistent with this Memorandum Opinion, and pursuant to Rule 9021 of the Federal Rules of Bankruptcy Procedure, will be entered in the main case and a separate judgment consistent with this Memorandum Opinion will be entered in this adversary proceeding.

Dated this the 29th day of May, 2008.

/s/ Tamara O. Mitchell
United States Bankruptcy Judge

22